1
2
3
4          **UNITED STATES DISTRICT COURT**
5              **DISTRICT OF NEVADA**
6                    * * *
7   GRO ELISABET SILLE,                    Case No. 2:07-CV-00901-KJD-VCF
8              Plaintiff,
                                           **ORDER**
9        v.
10  PARBALL CORPORATION, *et al.*,
11             Defendants.
12
13         Before the Court is intervenor creditor Lawsuit Financial Corporation's ("LF") Motion

14  for Summary Judgment (#306). Plaintiff opposed (#308) and LF replied (#312). Also before the

15  Court is Plaintiff's Motion for Summary Judgment (#307). LF opposed (#309) and Plaintiff

16  replied (#310). Finally, Plaintiff's sur-responses (#313, #314) and LF's sur-reply (#315) are

17  before the Court.

18  I. Background

19         Stephen Chakwin, ("Chakwin") and Michael Weisberg ("Weisberg") represented

20  Plaintiff in her personal injury case against Parball Corporation, *et al.* (#256). During the case,

21  Chakwin and Weisberg approached LF, a litigation financing business, and requested funds to

22  pay for Plaintiff's living, travel, medical, and trial costs until the proceedings were resolved

23  (#306, Ex. 1; #306, Ex. 2-2). Chakwin and Weisberg gave LF copies of Plaintiff's incident report

24  and medical records to support their request (#306, Ex. 1; #306, Ex. 2-3). Mark Bello, LF's

25  CEO, reviewed the documents and attempted to meet personally with Chakwin and Plaintiff

26  (#306, Ex. 1). When Bello was unable to meet with Plaintiff because Plaintiff lives in a foreign

country, Bello met with Abe Abrahamsen who claimed to be Plaintiff's personal representative in New York (#306, Ex. 1). After the meeting, LF agreed to provide Plaintiff $25,000, and sent Chakwin a Pending Litigation Purchase Agreement with Purchase Price Rebate Schedule ("Pending Agreement") (#306, Ex. 1). Chakwin then faxed LF the contract, which was signed and notarized (#306, Ex. 2-4). LF wired $25,000 to Chakwin's client trust account at Wachovia Bank NA of NJ/PA/NY upon receiving the contract (#306, Ex. 2-5). At some point, LF also received a copy of a signed promissory note that stated that Plaintiff agreed to advance Weisberg $25,000 (#306, Ex. 2-6). LF's motion and other documents do not state, however, when LF received the promissory note, from whom LF received it, or if it influenced LF's decision to enter into a contract with Plaintiff.

A month later, Chakwin asked LF for additional funds and updated LF's case information (#306, Ex. 1). LF agreed to provide $5,000, and sent a second Pending Agreement to Chakwin, who faxed LF the signed and notarized contract (#306, Ex. 2-7). LF then wired $5,000 to Chakwin's client trust account at Hudson Valley Bank (#306, Ex. 2-8).

Plaintiff's case settled and the Court ordered proofs of claim to facilitate disbursement (#216). LF filed its proof of claim (#236) and Plaintiff objected (#245). LF did not respond to Plaintiff's objection. Seven months later, LF submitted a trial memorandum (#297) requesting a portion of the settlement. LF then filed its Motion for Summary Judgment (#306), which Plaintiff opposed (#308), and LF subsequently replied (#312). Plaintiff filed a Motion for Summary Judgment (#307), which LF opposed (#309), and Plaintiff subsequently replied (#310). Plaintiff also filed two sur-responses (#313, #314) and LF filed a sur-reply (#315).[1]

---

[1] Plaintiff's "Addendum Exhibits" (#313, #314) are sur-responses and LF's reply to the filings (#315) is a sur-reply. Local Rule 7-2 (a)–(c) allows parties to file a motion, a response, and a reply. There is no provision that permits a party to file a sur-response or a sur-reply. Neither party requested the Court's leave to file additional documents. Ordinarily, the sur-responses and the sur-reply would be considered improper and stricken from the record; however, the Court will construe Plaintiff's sur-responses and LF's sur-reply as motions to file the respective documents. The Court grants Plaintiff and LF's motions and considers the sur-responses and sur-reply. The Court encourages both parties to file more complete motions, responses, and replies in the future. If a party finds its response or reply lacking, it must, at a minimum, request leave to file a sur-response or sur-reply.

1    <u>II. Summary Judgment Standard</u>

2       The purpose of summary judgment is to "pierce the pleadings and to assess the proof in

3 order to see whether there is a genuine need for trial." <u>Matsushita Elec. Indus. Co. v. Zenith</u>

4 <u>Radio Corp.</u>, 475 U.S. 574, 587 (1986). Summary judgment may be granted if the pleadings,

5 depositions, affidavits, and other materials of the record show that there is no genuine issue of

6 material fact and that the moving party is entitled to judgment as a matter of law. <u>See</u> Fᴇᴅ. R.

7 Cɪᴠ. P. 56(c); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

8       A fact is material if it might affect the outcome of the suit under the governing law.

9 <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Uncorroborated and self-serving

10 testimony, without more, will not create a genuine issue of material fact. <u>See</u> <u>Villiarimo v. Aloha</u>

11 <u>Island Air Inc.</u>, 281 F.3d 1054, 1061 (9th Cir. 2002). Conclusory or speculative testimony is also

12 insufficient to raise a genuine issue of fact. <u>Anheuser Busch, Inc. v. Natural Beverage Distribs.</u>,

13 69 F.3d 337, 345 (9th Cir. 1995).

14       The moving party bears the initial burden of showing the absence of a genuine issue of

15 material fact. <u>See</u> <u>Celotex</u>, 477 U.S. at 323. Once that burden is met, it then shifts to the

16 nonmoving party to set forth specific facts demonstrating that a genuine issue exists. <u>See</u>

17 <u>Matsushita</u>, 475 U.S. at 587; Fᴇᴅ. R. Cɪᴠ. P. 56(e). If the nonmoving party fails to make a

18 sufficient showing of an essential element for which it bears the burden of proof, the moving

19 party is entitled to summary judgment. <u>See</u> <u>Celotex</u>, 477 U.S. at 322-23.

20 <u>III. Analysis</u>

21       LF contends that it has a valid claim to a portion of Plaintiff's settlement. LF argues that

22 its claim is valid because the proceeds were properly assigned and LF has a binding contract with

23 Plaintiff. LF also claims that even if Plaintiff's signatures were forged on LF's contract, the

24 contract is still valid under agency law because LF reasonably relied on Chakwin and Weisberg's

25 apparent authority as Plaintiff's agents.

26 *///*

3

1      In Plaintiff's response, Plaintiff argues that LF does not have a valid claim. Plaintiff

2   claims that the contract is not binding because her signature was forged and Plaintiff had no

3   knowledge of the contract. Plaintiff also argues that agency law does not apply to attorney-client

4   relationships under Nevada law.

5          A. Attorney-Client Relationships

6              i. Legal Standard

7      The attorney-client relationship is a quintessential principal-agent relationship.

8   C.I.R. v. Banks, 543 U.S. 426, 427 (2005). In this relationship, the client retains ultimate control

9   over the underlying claim and its settlement, while the attorney makes tactical decisions to

10   further the client's interests. See Id. Because a client voluntarily chooses her attorney, she often

11   cannot escape the consequences of her attorney's acts or omissions, even if it influences the

12   outcome of a case. See Link v. Wabash R.R. Co., 370 U.S. 626, 633-34 (1962) (holding that

13   dismissal of a client's case because of his counsel's unexcused conduct was not an unjust penalty

14   on the client).

15      Some states treat an attorney-client relationship differently than other principal-

16   agent relationships in an effort to protect clients from the acts of their sophisticated agents. See

17   e.g. Givens v. Mullikin ex rel. Est. of McElwaney, 75 S.W.3d 383, 397-98 (Tenn. 2002) (noting

18   that a client should not be liable in tort for virtually every action taken by the attorney during the

19   representation, irrespective of whether the client directed or knew about the actions). The

20   Supreme Court of Nevada has addressed the treatment of attorney-client relationships

21   infrequently, and has outlined only a few circumstances when they should be treated differently

22   than traditional agent-principal relationships. See NC-DSH, Inc. v. Garner, 218 P.3d 853, 860

23   (Nev. 2009) (stating that, when the question is whether a settlement agreed to by the attorney

24   binds the client, attorney-client relationships are treated differently than other agent-principal

25   relationships); Passarelli v. J-Mar Dev., Inc., 720 P.2d 1221, 1223 (Nev. 1986) (holding that a

26   court may vacate a judgment on account of an attorney's excusable neglect).

1          ii. Analysis

2          LF states that agency law governs the current case, while Plaintiff argues that

3 traditional agency law does not apply to attorney-client relationships when an attorney commits

4 fraud. Plaintiff contends that NC-DSH, Inc. v. Garner, a Supreme Court of Nevada case, is the

5 controlling law, and protects a client from any fraudulent acts performed by her attorney.

6 Plaintiff is incorrect. In Garner, the Supreme Court of Nevada held that an attorney-client

7 relationship should be treated differently when addressing the question of whether a settlement

8 agreed to by an attorney is binding on a client. Garner, 218 P.3d at 860. The current motions

9 before the Court do not question whether the underlying settlement between Plaintiff and

10 Defendant is valid. Instead, they focus on how the settlement should be distributed and whether a

11 private contract assigning a portion of the settlement to LF is valid. Garner, therefore, does not

12 apply to the current case.

13          Plaintiff fails to show the Court how, in Nevada, an attorney-client relationship is

14 treated differently than other agent-principal relationships when an attorney attempts to bind his

15 client in a fraudulent *non-settlement* contract with third parties. The Court declines to engage in

16 predictive ruling and entertain Plaintiff's assertion without supporting Nevada law. The Court,

17 therefore, turns to traditional principles of agency.

18      B. Agency Law

19         i. Legal Standard

20          Nevada law typically holds a principal responsible for any negative consequences

21 of its agent's actions. See e.g. Id. (stating that, ordinarily, the sins of an agent are visited upon his

22 principal, not the innocent third party with whom the dishonest agent dealt). A principal may be

23 bound by its agent's actions even when the principal had no reason to know of its agent's

24 misconduct. Homes Sav. Ass'n v. Gen. Elec. Credit Corp., 708 P.2d 280, 283 (Nev. 1985). This

25 is true even when the agent "acts for his own motives and without benefit to his principal." Id.

26 ///

1        An agent must have actual authority, express or implied, or apparent authority to

2   bind its principal. Dixon v. Thatcher, 742 P.2d 1029, 1031 (Nev. 1987). A party claiming

3   apparent authority of an agent as a basis for contract formation must prove (1) that it subjectively

4   believed that the agent had authority to act for the principal and (2) that its subjective belief in

5   the agent's authority was objectively reasonable. Great Am. Ins. Co. v. Gen. Builders, Inc., 934

6   P.2d 257, 261 (Nev. 1997). The party claiming apparent authority must not close its eyes to

7   warnings or inconsistent circumstances. See Id. Apparent authority, including a third party's

8   reasonable reliance on such authority, is a question of fact. Id.

9            ii. Analysis

10        It is unclear from the record if Chakwin and Weisberg had actual authority.

11  Before Chakwin approached LF, Plaintiff discussed with Chakwin the possibility of obtaining

12  financing from outside sources (#306, Ex. 2-11, page 34, lines 21-25). Despite this discussion,

13  Plaintiff stated that she never knew that Chakwin and Weisberg took out a loan (#306, Ex. 2-11,

14  page 35, lines 20-21). Nevertheless, Chakwin faxed LF a notarized contract that purportedly

15  contains Plaintiff's signature (#306, Ex. 2-4). Plaintiff alleges that these signatures are forgeries

16  and that Weisberg admitted to forging them on LF's contract (#307), but the record is

17  inconclusive. Although Weisberg admitted to forging other signatures (#314, Ex. 1, page 90,

18  lines 20-25, page 96, lines1-2), he stated that he did not forge the signatures on LF's contract,

19  that at least one of the signatures appeared to be Plaintiff's, and that someone else may have

20  forged another signature on LF's contract (#314, Ex. 1, page 95, lines 11-25, page 96, lines 1-

21  22). Due to the conflicting and sparse evidence in the record, the Court declines to determine

22  whether Chakwin and Weisberg had actual authority. In the absence of clear actual authority, the

23  Court analyzes Chakwin and Weisberg's apparent authority.

24        To successfully prove that Chakwin and Weisberg had apparent authority, LF

25  must show (1) that LF believed that Chakwin and Weisberg had authority to act for Plaintiff and

26  (2) that LF's belief was objectively reasonable. See Great Am. Ins. Co., 934 P.2d at 261.

1          Chakwin and Weisberg's actions, LF's actions, and LF's uncontested assertions in

2 its motion for summary judgment suggest that LF believed Chakwin and Weisberg had authority

3 to act for Plaintiff. First, Chakwin and Weisberg made several manifestations that they had

4 authority. Chakwin approached LF, manifested to LF that he was Plaintiff's attorney, and

5 requested funds for Plaintiff to use (#306, Ex. 1; #306, Ex. 2-1; #306, Ex. 2-2). Chakwin sent LF

6 several confidential documents, such as Plaintiff's medical records (#306, Ex. 1). Chakwin also

7 faxed LF two signed and notarized contracts (#306, Ex. 2-4; #306, Ex. 2-7). Second, LF's

8 actions suggested that it believed Chakwin and Weisberg had authority. Upon receiving

9 Plaintiff's case and medical information, Bello attempted to personally meet with Chakwin and

10 Plaintiff to discuss Plaintiff's financing (#306, Ex. 1). When Bello was unable to meet with

11 Plaintiff, he met with Abrahamsen instead (#306, Ex. 1). Once Chakwin sent LF a signed and

12 notarized contract, LF wired $30,000 to Chakwin's client trust accounts and electronically

13 confirmed the transfer (#306, Ex. 2-5; #306, Ex. 2-8). Third, LF claims in its motion for

14 summary judgment that Bello believed Chakwin and Weisberg had authority (#306, Ex. 1).

15 Plaintiff does not dispute LF's belief. These facts are sufficient to show that LF believed

16 Chakwin and Weisberg had authority.

17          The Court now examines whether this belief was reasonable. LF asserts that its

18 belief was reasonable because the contracts were fully executed, LF took measures to verify

19 Chakwin and Weisberg's authority, and there were no warnings indicating Chakwin and

20 Weisberg did not have authority. LF begins by arguing that Plaintiff signed the contract (#306).

21 Upon inspection, the contracts are not only signed, but also notarized, which gives them an

22 inherent credibility (#306, Ex. 2-4; #306, Ex. 2-7). LF further alleges that Bello reviewed the

23 case information, attempted to personally discuss the case with Plaintiff, and, when Plaintiff was

24 unavailable, met with Abrahamsen (#306, Ex. 1). LF finally explains that none of the meetings,

25 materials, or circumstances suggested that Chakwin and Weisberg did not have authority. This is

26 sufficient to shift the burden to Plaintiff to create a genuine issue of fact.

1    Plaintiff alleges that LF's belief was unreasonable because LF was negligent in

2  procuring the contract. In the documents submitted to the Court, Plaintiff (1) argues that LF did

3  not contact Plaintiff's Nevada counsel, (2) argues that LF did not confirm the wire transfer with

4  Plaintiff personally, and (3) accuses LF of general negligence. Plaintiff's arguments do not have

5  merit. First, Plaintiff argues that LF should have contacted Hanratty, one of Plaintiff's local

6  Nevada attorneys, before agreeing to provide Plaintiff the requested funds. LF's contract with

7  Plaintiff was made through Chakwin and Weisberg, Plaintiff's New York agents (#306, Exs. 1,

8  2-1, 2-4, and 2-7). Bello reviewed the information Chakwin provided and met with Chakwin and

9  Abrahamsen (#306, Ex. 1). Plaintiff fails to direct the Court to any authority that puts LF under

10  an additional obligation to contact Hanratty before entering the contract. Second, Plaintiff alleges

11  that LF should have spoken to Plaintiff personally to confirm that she received the funds. LF

12  wired the funds to the accounts described in LF's contracts, which were signed and notarized,

13  and received electronic confirmation of the wire transfers (#306, Exs. 2-4, 2-5, 2-7, and 2-8).

14  Plaintiff fails to show the Court any authority that puts LF under an additional duty to confirm

15  the transfer with Plaintiff personally. Third, Plaintiff's general allegations of negligence do not

16  detail how LF failed to meet the standards of the financing industry when it entered a contract

17  with Plaintiff. Thus, Plaintiff's arguments are not sufficient to create a genuine issue of fact.

18    Plaintiff further argues that Chakwin and Weisberg's alleged fraud invalidates

19  LF's contract. This assertion is incorrect. In the current case, Plaintiff was Chakwin and

20  Weisberg's principal, and they were her agents. A principal may be bound by the acts of its agent

21  as to third parties, even in the event of fraud. See Homes Sav. Ass'n., 708 P.2d at 283. Plaintiff's

22  alleged fraud, therefore, is not a determining factor by itself. Furthermore, Plaintiff merely

23  alleges fraud in the motion for summary judgment, and has not shown its existence through

24  specific pleadings and facts in the record. Consequently, the possibility of fraud does not factor

25  heavily into the Court's analysis.

26  ///

1          Even if a client merits greater protection than other principals because of an

2    attorney's sophistication, the facts are still sufficient to show that LF's belief was reasonable.

3    Bello reviewed Plaintiff's case and the documents. Bello attempted to meet personally with

4    Plaintiff and Chakwin. When Bello couldn't meet with Plaintiff, he met with Abrahamsen,

5    Plaintiff's personal representative in New York. LF reviewed the contract, which was inherently

6    credible because it was signed and notarized. LF also electronically verified the wire transfers it

7    made. In short, LF could not have reasonably done much more to verify the authenticity of its

8    transaction with Plaintiff, especially when Plaintiff lives in a foreign country and could not

9    afford to travel to the United States. Accordingly, the Court is satisfied with LF's efforts in the

10   current case.

11         The Court notes it may be advisable for a litigation creditor to receive or make

12   copies of a client's personal identification, such as a driver's license or passport, and compare

13   the client's signature to its documents before it approves disbursement. It may also be advisable

14   to meet personally with a prospective client and her attorney to explain the contract and discuss

15   financing. When a personal meeting is unreasonable, a litigation creditor may want to find a

16   viable alternative, such as teleconferencing. However, while advisable, LF's failure to implement

17   these measures in the current case does not make LF's belief unreasonable, nor suggest that LF

18   attempted to ignore any warnings or inconsistencies. Thus, the Court finds that Chakwin and

19   Weisberg had apparent authority to bind Plaintiff to LF's contract.

20         C. Fraud on the Court

21         Plaintiff argues at great length that Chakwin and Weisberg committed fraud on the court.

22   Plaintiff reasons that, since Chakwin and Weisberg are attorneys—officers of the court—they

23   committed fraud on the court when they forged Plaintiff's signature on LF's contract. This

24   reasoning is incorrect.

25   ///

26   ///

1            i. Legal Standard

2            Not all fraud is fraud on the court. In re Levander, 180 F.3d 1114, 1119 (9th Cir.

3    1999). Fraud on the court is a narrow term that applies to fraud that is aimed directly at the court,

4    not at third parties. See Appling v. State Farm Mut. Auto. Ins. Co., 340 F.3d 769, 780 (9th Cir.

5    2003). Such fraud harms the integrity of the judicial process by preventing the court from

6    performing, in the usual manner, its impartial task of adjudging cases that are presented for

7    adjudication." See Levander, 180 F.3d at 1119.

8            ii. Analysis

9            In the current case, the alleged fraud is not directed at the Court. It involves a

10   contract between the Plaintiff and LF, which are two private parties. Although the fraud was

11   allegedly performed by Plaintiff's attorneys, they did not do so in their capacity of officers of the

12   Court. Compare Garner, 218 P.3d at 858 (stating that an attorney who gave a fraudulent

13   settlement claim to the court did so in his capacity as an officer of the court) with Maracich v.

14   Spears, 133 S. Ct. 2191, 2201 (2013) (recognizing that attorneys have three distinct roles, self-

15   employed businessmen, agents of their clients, and officers of the court, each of which are

16   governed by different laws and regulations). Further, their fraud did not interfere with the

17   Court's adjudication in Plaintiff's underlying personal injury case. Therefore, the fraud in the

18   current case is not fraud on the Court.

19       E. Plaintiff's Motion for Summary Judgment

20           Plaintiff also requests summary judgment regarding two additional proof of claims. The

21   first proof of claim belongs to Pre-Settlement Solutions, Inc. ("PSS"). The second belongs to

22   Bridgefunds, LLC ("BF").

23           i. Pre-Settlement Solutions' Proof of Claim

24           PSS filed a proof of claim with the Court (#230). PSS's proof of claim states that

25   PSS has a secured, perfected claim of $97,375. Id. Plaintiff objected to PSS's proof of claim

26   (#245). PSS did not respond to Plaintiff's objection or file any motions with the Court. Plaintiff

1   filed her motion for summary judgment and asked the Court to reject PSS's proof of claim

2   (#307). PSS did not respond.

3        PSS is now several months late in responding to Plaintiff's motion for summary

4   judgment. PSS's failure to file points and authorities in response to Plaintiff's motion constitutes

5   PSS's consent to the granting of Plaintiff's motion. LR 7-2(d). This Court and the Ninth Circuit

6   Court of Appeals, however, have a strong interest in ruling on the merits of a case whenever

7   possible. See e.g. Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir. 1986) (describing the

8   factors for default judgment and noting the strong policy for deciding cases on their merits). To

9   that end, the Court provides PSS an opportunity to present the merits to the Court. The Court

10  orders PSS to show cause in writing within fourteen (14) days of entry of this order why the

11  Court should not reject PSS's proof of claim. If PSS does not show cause, the Court will reject

12  PSS's proof of claim for failure to prosecute. See FED. R. CIV. P. 41(b).

13       ii. Bridgefunds' Proof of Claim

14       BF filed a proof of claim with the Court (#233) and Plaintiff objected (#245). BF

15  responded (#246) and filed a Motion for Discovery and an Evidentiary Hearing (#247, #248).

16  Plaintiff responded (#250, #251) and BF replied (#252). The Court granted BF's motion (#257)

17  and BF requested documents (#272) and performed several depositions (#278, #279, #287,

18  #289). BF then filed a Stipulation and Proposed Order for Disbursement (#304), which the Court

19  granted (#305).

20       Plaintiff states that Plaintiff and BF have settled the proof of claim and filed the

21  terms of the agreement with the Court. The Court agrees. Both Plaintiff and BF signed the

22  Stipulation and Proposed Order for Disbursement (#304) and the Court granted the order (#305).

23  Therefore, BF's proof of claim is no longer at issue before the Court.

24  ///

25  ///

26  ///

11

IV. Conclusion

Accordingly, it is **HEREBY ORDERED** that Lawsuit Financial's Motion for Summary Judgment (#306) is **GRANTED**;

**IT IS FURTHER ORDERED** that intervenor Pre-Settlement Solutions file a written response to the Court's order to show cause within fourteen (14) days of the entry of this order;

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (#307) is **GRANTED IN PART** as to Bridgefunds, LLC's proof of claim, **DENIED IN PART** as to Pre-Settlement Solutions' proof of claim without prejudice, and **DENIED IN PART** as to Lawsuit Financial's proof of claim with prejudice.

DATED this 6th day of June 2014.

_____

Kent J. Dawson
United States District Judge

12