UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| GRO ELISABET SILLE,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>PARBALL CORPORATION, *et al.*,<br><br>　　　　　Defendants. | Case No. 2:07-CV-00901-KJD-VCF<br><br>**ORDER** |

Before the Court is intervenor creditor Lawsuit Financial Corporation's ("LF") Motion for Summary Judgment (#306). Plaintiff opposed (#308) and LF replied (#312). Also before the Court is Plaintiff's Motion for Summary Judgment (#307). LF opposed (#309) and Plaintiff replied (#310). Finally, Plaintiff's sur-responses (#313, #314) and LF's sur-reply (#315) are before the Court.

I. Background

Stephen Chakwin, ("Chakwin") and Michael Weisberg ("Weisberg") represented Plaintiff in her personal injury case against Parball Corporation, *et al.* (#256). During the case, Chakwin and Weisberg approached LF, a litigation financing business, and requested funds to pay for Plaintiff's living, travel, medical, and trial costs until the proceedings were resolved (#306, Ex. 1; #306, Ex. 2-2). Chakwin and Weisberg gave LF copies of Plaintiff's incident report and medical records to support their request (#306, Ex. 1; #306, Ex. 2-3). Mark Bello, LF's CEO, reviewed the documents and attempted to meet personally with Chakwin and Plaintiff (#306, Ex. 1). When Bello was unable to meet with Plaintiff because Plaintiff lives in a foreign

1  country, Bello met with Abe Abrahamsen who claimed to be Plaintiff's personal representative
2  in New York (#306, Ex. 1). After the meeting, LF agreed to provide Plaintiff $25,000, and sent
3  Chakwin a Pending Litigation Purchase Agreement with Purchase Price Rebate Schedule
4  ("Pending Agreement") (#306, Ex. 1). Chakwin then faxed LF the contract, which was signed
5  and notarized (#306, Ex. 2-4). LF wired $25,000 to Chakwin's client trust account at Wachovia
6  Bank NA of NJ/PA/NY upon receiving the contract (#306, Ex. 2-5). At some point, LF also
7  received a copy of a signed promissory note that stated that Plaintiff agreed to advance Weisberg
8  $25,000 (#306, Ex. 2-6). LF's motion and other documents do not state, however, when LF
9  received the promissory note, from whom LF received it, or if it influenced LF's decision to
10 enter into a contract with Plaintiff.

11 A month later, Chakwin asked LF for additional funds and updated LF's case information
12 (#306, Ex. 1). LF agreed to provide $5,000, and sent a second Pending Agreement to Chakwin,
13 who faxed LF the signed and notarized contract (#306, Ex. 2-7). LF then wired $5,000 to
14 Chakwin's client trust account at Hudson Valley Bank (#306, Ex. 2-8).

15 Plaintiff's case settled and the Court ordered proofs of claim to facilitate disbursement
16 (#216). LF filed its proof of claim (#236) and Plaintiff objected (#245). LF did not respond to
17 Plaintiff's objection. Seven months later, LF submitted a trial memorandum (#297) requesting a
18 portion of the settlement. LF then filed its Motion for Summary Judgment (#306), which Plaintiff
19 opposed (#308), and LF subsequently replied (#312). Plaintiff filed a Motion for Summary
20 Judgment (#307), which LF opposed (#309), and Plaintiff subsequently replied (#310). Plaintiff
21 also filed two sur-responses (#313, #314) and LF filed a sur-reply (#315).[1]

---

[1] Plaintiff's "Addendum Exhibits" (#313, #314) are sur-responses and LF's reply to the filings (#315) is a sur-reply. Local Rule 7-2 (a)–(c) allows parties to file a motion, a response, and a reply. There is no provision that permits a party to file a sur-response or a sur-reply. Neither party requested the Court's leave to file additional documents. Ordinarily, the sur-responses and the sur-reply would be considered improper and stricken from the record; however, the Court will construe Plaintiff's sur-responses and LF's sur-reply as motions to file the respective documents. The Court grants Plaintiff and LF's motions and considers the sur-responses and sur-reply. The Court encourages both parties to file more complete motions, responses, and replies in the future. If a party finds its response or reply lacking, it must, at a minimum, request leave to file a sur-response or sur-reply.

2

## II. Summary Judgment Standard

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment may be granted if the pleadings, depositions, affidavits, and other materials of the record show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material if it might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Uncorroborated and self-serving testimony, without more, will not create a genuine issue of material fact. See Villiarimo v. Aloha Island Air Inc., 281 F.3d 1054, 1061 (9th Cir. 2002). Conclusory or speculative testimony is also insufficient to raise a genuine issue of fact. Anheuser Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337, 345 (9th Cir. 1995).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323. Once that burden is met, it then shifts to the nonmoving party to set forth specific facts demonstrating that a genuine issue exists. See Matsushita, 475 U.S. at 587; FED. R. CIV. P. 56(e). If the nonmoving party fails to make a sufficient showing of an essential element for which it bears the burden of proof, the moving party is entitled to summary judgment. See Celotex, 477 U.S. at 322-23.

## III. Analysis

LF contends that it has a valid claim to a portion of Plaintiff's settlement. LF argues that its claim is valid because the proceeds were properly assigned and LF has a binding contract with Plaintiff. LF also claims that even if Plaintiff's signatures were forged on LF's contract, the contract is still valid under agency law because LF reasonably relied on Chakwin and Weisberg's apparent authority as Plaintiff's agents.

///

1    In Plaintiff's response, Plaintiff argues that LF does not have a valid claim. Plaintiff claims that the contract is not binding because her signature was forged and Plaintiff had no knowledge of the contract. Plaintiff also argues that agency law does not apply to attorney-client relationships under Nevada law.

### A. Attorney-Client Relationships

#### i. Legal Standard

The attorney-client relationship is a quintessential principal-agent relationship. C.I.R. v. Banks, 543 U.S. 426, 427 (2005). In this relationship, the client retains ultimate control over the underlying claim and its settlement, while the attorney makes tactical decisions to further the client's interests. See Id. Because a client voluntarily chooses her attorney, she often cannot escape the consequences of her attorney's acts or omissions, even if it influences the outcome of a case. See Link v. Wabash R.R. Co., 370 U.S. 626, 633-34 (1962) (holding that dismissal of a client's case because of his counsel's unexcused conduct was not an unjust penalty on the client).

Some states treat an attorney-client relationship differently than other principal-agent relationships in an effort to protect clients from the acts of their sophisticated agents. See e.g. Givens v. Mullikin ex rel. Est. of McElwaney, 75 S.W.3d 383, 397-98 (Tenn. 2002) (noting that a client should not be liable in tort for virtually every action taken by the attorney during the representation, irrespective of whether the client directed or knew about the actions). The Supreme Court of Nevada has addressed the treatment of attorney-client relationships infrequently, and has outlined only a few circumstances when they should be treated differently than traditional agent-principal relationships. See NC-DSH, Inc. v. Garner, 218 P.3d 853, 860 (Nev. 2009) (stating that, when the question is whether a settlement agreed to by the attorney binds the client, attorney-client relationships are treated differently than other agent-principal relationships); Passarelli v. J-Mar Dev., Inc., 720 P.2d 1221, 1223 (Nev. 1986) (holding that a court may vacate a judgment on account of an attorney's excusable neglect).

4

     ii. Analysis

     LF states that agency law governs the current case, while Plaintiff argues that traditional agency law does not apply to attorney-client relationships when an attorney commits fraud. Plaintiff contends that NC-DSH, Inc. v. Garner, a Supreme Court of Nevada case, is the controlling law, and protects a client from any fraudulent acts performed by her attorney. Plaintiff is incorrect. In Garner, the Supreme Court of Nevada held that an attorney-client relationship should be treated differently when addressing the question of whether a settlement agreed to by an attorney is binding on a client. Garner, 218 P.3d at 860. The current motions before the Court do not question whether the underlying settlement between Plaintiff and Defendant is valid. Instead, they focus on how the settlement should be distributed and whether a private contract assigning a portion of the settlement to LF is valid. Garner, therefore, does not apply to the current case.

     Plaintiff fails to show the Court how, in Nevada, an attorney-client relationship is treated differently than other agent-principal relationships when an attorney attempts to bind his client in a fraudulent *non-settlement* contract with third parties. The Court declines to engage in predictive ruling and entertain Plaintiff's assertion without supporting Nevada law. The Court, therefore, turns to traditional principles of agency.

  B. Agency Law

     i. Legal Standard

     Nevada law typically holds a principal responsible for any negative consequences of its agent's actions. See e.g. Id. (stating that, ordinarily, the sins of an agent are visited upon his principal, not the innocent third party with whom the dishonest agent dealt). A principal may be bound by its agent's actions even when the principal had no reason to know of its agent's misconduct. Homes Sav. Ass'n v. Gen. Elec. Credit Corp., 708 P.2d 280, 283 (Nev. 1985). This is true even when the agent "acts for his own motives and without benefit to his principal." Id.

///

An agent must have actual authority, express or implied, or apparent authority to bind its principal. Dixon v. Thatcher, 742 P.2d 1029, 1031 (Nev. 1987). A party claiming apparent authority of an agent as a basis for contract formation must prove (1) that it subjectively believed that the agent had authority to act for the principal and (2) that its subjective belief in the agent's authority was objectively reasonable. Great Am. Ins. Co. v. Gen. Builders, Inc., 934 P.2d 257, 261 (Nev. 1997). The party claiming apparent authority must not close its eyes to warnings or inconsistent circumstances. See Id. Apparent authority, including a third party's reasonable reliance on such authority, is a question of fact. Id.

    ii. Analysis

It is unclear from the record if Chakwin and Weisberg had actual authority. Before Chakwin approached LF, Plaintiff discussed with Chakwin the possibility of obtaining financing from outside sources (#306, Ex. 2-11, page 34, lines 21-25). Despite this discussion, Plaintiff stated that she never knew that Chakwin and Weisberg took out a loan (#306, Ex. 2-11, page 35, lines 20-21). Nevertheless, Chakwin faxed LF a notarized contract that purportedly contains Plaintiff's signature (#306, Ex. 2-4). Plaintiff alleges that these signatures are forgeries and that Weisberg admitted to forging them on LF's contract (#307), but the record is inconclusive. Although Weisberg admitted to forging other signatures (#314, Ex. 1, page 90, lines 20-25, page 96, lines1-2), he stated that he did not forge the signatures on LF's contract, that at least one of the signatures appeared to be Plaintiff's, and that someone else may have forged another signature on LF's contract (#314, Ex. 1, page 95, lines 11-25, page 96, lines 1-22). Due to the conflicting and sparse evidence in the record, the Court declines to determine whether Chakwin and Weisberg had actual authority. In the absence of clear actual authority, the Court analyzes Chakwin and Weisberg's apparent authority.

To successfully prove that Chakwin and Weisberg had apparent authority, LF must show (1) that LF believed that Chakwin and Weisberg had authority to act for Plaintiff and (2) that LF's belief was objectively reasonable. See Great Am. Ins. Co., 934 P.2d at 261.

1　　　　　　　　Chakwin and Weisberg's actions, LF's actions, and LF's uncontested assertions in
2　its motion for summary judgment suggest that LF believed Chakwin and Weisberg had authority
3　to act for Plaintiff. First, Chakwin and Weisberg made several manifestations that they had
4　authority. Chakwin approached LF, manifested to LF that he was Plaintiff's attorney, and
5　requested funds for Plaintiff to use (#306, Ex. 1; #306, Ex. 2-1; #306, Ex. 2-2). Chakwin sent LF
6　several confidential documents, such as Plaintiff's medical records (#306, Ex. 1). Chakwin also
7　faxed LF two signed and notarized contracts (#306, Ex. 2-4; #306, Ex. 2-7). Second, LF's
8　actions suggested that it believed Chakwin and Weisberg had authority. Upon receiving
9　Plaintiff's case and medical information, Bello attempted to personally meet with Chakwin and
10　Plaintiff to discuss Plaintiff's financing (#306, Ex. 1). When Bello was unable to meet with
11　Plaintiff, he met with Abrahamsen instead (#306, Ex. 1). Once Chakwin sent LF a signed and
12　notarized contract, LF wired $30,000 to Chakwin's client trust accounts and electronically
13　confirmed the transfer (#306, Ex. 2-5; #306, Ex. 2-8). Third, LF claims in its motion for
14　summary judgment that Bello believed Chakwin and Weisberg had authority (#306, Ex. 1).
15　Plaintiff does not dispute LF's belief. These facts are sufficient to show that LF believed
16　Chakwin and Weisberg had authority.

17　　　　　　　　The Court now examines whether this belief was reasonable. LF asserts that its
18　belief was reasonable because the contracts were fully executed, LF took measures to verify
19　Chakwin and Weisberg's authority, and there were no warnings indicating Chakwin and
20　Weisberg did not have authority. LF begins by arguing that Plaintiff signed the contract (#306).
21　Upon inspection, the contracts are not only signed, but also notarized, which gives them an
22　inherent credibility (#306, Ex. 2-4; #306, Ex. 2-7). LF further alleges that Bello reviewed the
23　case information, attempted to personally discuss the case with Plaintiff, and, when Plaintiff was
24　unavailable, met with Abrahamsen (#306, Ex. 1). LF finally explains that none of the meetings,
25　materials, or circumstances suggested that Chakwin and Weisberg did not have authority. This is
26　sufficient to shift the burden to Plaintiff to create a genuine issue of fact.

1    Plaintiff alleges that LF's belief was unreasonable because LF was negligent in
2 procuring the contract. In the documents submitted to the Court, Plaintiff (1) argues that LF did
3 not contact Plaintiff's Nevada counsel, (2) argues that LF did not confirm the wire transfer with
4 Plaintiff personally, and (3) accuses LF of general negligence. Plaintiff's arguments do not have
5 merit. First, Plaintiff argues that LF should have contacted Hanratty, one of Plaintiff's local
6 Nevada attorneys, before agreeing to provide Plaintiff the requested funds. LF's contract with
7 Plaintiff was made through Chakwin and Weisberg, Plaintiff's New York agents (#306, Exs. 1,
8 2-1, 2-4, and 2-7). Bello reviewed the information Chakwin provided and met with Chakwin and
9 Abrahamsen (#306, Ex. 1). Plaintiff fails to direct the Court to any authority that puts LF under
10 an additional obligation to contact Hanratty before entering the contract. Second, Plaintiff alleges
11 that LF should have spoken to Plaintiff personally to confirm that she received the funds. LF
12 wired the funds to the accounts described in LF's contracts, which were signed and notarized,
13 and received electronic confirmation of the wire transfers (#306, Exs. 2-4, 2-5, 2-7, and 2-8).
14 Plaintiff fails to show the Court any authority that puts LF under an additional duty to confirm
15 the transfer with Plaintiff personally. Third, Plaintiff's general allegations of negligence do not
16 detail how LF failed to meet the standards of the financing industry when it entered a contract
17 with Plaintiff. Thus, Plaintiff's arguments are not sufficient to create a genuine issue of fact.

18    Plaintiff further argues that Chakwin and Weisberg's alleged fraud invalidates
19 LF's contract. This assertion is incorrect. In the current case, Plaintiff was Chakwin and
20 Weisberg's principal, and they were her agents. A principal may be bound by the acts of its agent
21 as to third parties, even in the event of fraud. See Homes Sav. Ass'n., 708 P.2d at 283. Plaintiff's
22 alleged fraud, therefore, is not a determining factor by itself. Furthermore, Plaintiff merely
23 alleges fraud in the motion for summary judgment, and has not shown its existence through
24 specific pleadings and facts in the record. Consequently, the possibility of fraud does not factor
25 heavily into the Court's analysis.
26 ///

1       Even if a client merits greater protection than other principals because of an
2  attorney's sophistication, the facts are still sufficient to show that LF's belief was reasonable.
3  Bello reviewed Plaintiff's case and the documents. Bello attempted to meet personally with
4  Plaintiff and Chakwin. When Bello couldn't meet with Plaintiff, he met with Abrahamsen,
5  Plaintiff's personal representative in New York. LF reviewed the contract, which was inherently
6  credible because it was signed and notarized. LF also electronically verified the wire transfers it
7  made. In short, LF could not have reasonably done much more to verify the authenticity of its
8  transaction with Plaintiff, especially when Plaintiff lives in a foreign country and could not
9  afford to travel to the United States. Accordingly, the Court is satisfied with LF's efforts in the
10 current case.
11      The Court notes it may be advisable for a litigation creditor to receive or make
12 copies of a client's personal identification, such as a driver's license or passport, and compare
13 the client's signature to its documents before it approves disbursement. It may also be advisable
14 to meet personally with a prospective client and her attorney to explain the contract and discuss
15 financing. When a personal meeting is unreasonable, a litigation creditor may want to find a
16 viable alternative, such as teleconferencing. However, while advisable, LF's failure to implement
17 these measures in the current case does not make LF's belief unreasonable, nor suggest that LF
18 attempted to ignore any warnings or inconsistencies. Thus, the Court finds that Chakwin and
19 Weisberg had apparent authority to bind Plaintiff to LF's contract.
20      C. Fraud on the Court
21      Plaintiff argues at great length that Chakwin and Weisberg committed fraud on the court.
22 Plaintiff reasons that, since Chakwin and Weisberg are attorneys—officers of the court—they
23 committed fraud on the court when they forged Plaintiff's signature on LF's contract. This
24 reasoning is incorrect.
25 ///
26 ///

1          i. Legal Standard

2          Not all fraud is fraud on the court. In re Levander, 180 F.3d 1114, 1119 (9th Cir. 1999). Fraud on the court is a narrow term that applies to fraud that is aimed directly at the court, not at third parties. See Appling v. State Farm Mut. Auto. Ins. Co., 340 F.3d 769, 780 (9th Cir. 2003). Such fraud harms the integrity of the judicial process by preventing the court from performing, in the usual manner, its impartial task of adjudging cases that are presented for adjudication." See Levander, 180 F.3d at 1119.

          ii. Analysis

          In the current case, the alleged fraud is not directed at the Court. It involves a contract between the Plaintiff and LF, which are two private parties. Although the fraud was allegedly performed by Plaintiff's attorneys, they did not do so in their capacity of officers of the Court. Compare Garner, 218 P.3d at 858 (stating that an attorney who gave a fraudulent settlement claim to the court did so in his capacity as an officer of the court) with Maracich v. Spears, 133 S. Ct. 2191, 2201 (2013) (recognizing that attorneys have three distinct roles, self-employed businessmen, agents of their clients, and officers of the court, each of which are governed by different laws and regulations). Further, their fraud did not interfere with the Court's adjudication in Plaintiff's underlying personal injury case. Therefore, the fraud in the current case is not fraud on the Court.

     E. Plaintiff's Motion for Summary Judgment

     Plaintiff also requests summary judgment regarding two additional proof of claims. The first proof of claim belongs to Pre-Settlement Solutions, Inc. ("PSS"). The second belongs to Bridgefunds, LLC ("BF").

          i. Pre-Settlement Solutions' Proof of Claim

          PSS filed a proof of claim with the Court (#230). PSS's proof of claim states that PSS has a secured, perfected claim of $97,375. Id. Plaintiff objected to PSS's proof of claim (#245). PSS did not respond to Plaintiff's objection or file any motions with the Court. Plaintiff

1   filed her motion for summary judgment and asked the Court to reject PSS's proof of claim

2   (#307). PSS did not respond.

3   PSS is now several months late in responding to Plaintiff's motion for summary

4   judgment. PSS's failure to file points and authorities in response to Plaintiff's motion constitutes

5   PSS's consent to the granting of Plaintiff's motion. LR 7-2(d). This Court and the Ninth Circuit

6   Court of Appeals, however, have a strong interest in ruling on the merits of a case whenever

7   possible. See e.g. Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir. 1986) (describing the

8   factors for default judgment and noting the strong policy for deciding cases on their merits). To

9   that end, the Court provides PSS an opportunity to present the merits to the Court. The Court

10  orders PSS to show cause in writing within fourteen (14) days of entry of this order why the

11  Court should not reject PSS's proof of claim. If PSS does not show cause, the Court will reject

12  PSS's proof of claim for failure to prosecute. See FED. R. CIV. P. 41(b).

13          ii. Bridgefunds' Proof of Claim

14  BF filed a proof of claim with the Court (#233) and Plaintiff objected (#245). BF

15  responded (#246) and filed a Motion for Discovery and an Evidentiary Hearing (#247, #248).

16  Plaintiff responded (#250, #251) and BF replied (#252). The Court granted BF's motion (#257)

17  and BF requested documents (#272) and performed several depositions (#278, #279, #287,

18  #289). BF then filed a Stipulation and Proposed Order for Disbursement (#304), which the Court

19  granted (#305).

20  Plaintiff states that Plaintiff and BF have settled the proof of claim and filed the

21  terms of the agreement with the Court. The Court agrees. Both Plaintiff and BF signed the

22  Stipulation and Proposed Order for Disbursement (#304) and the Court granted the order (#305).

23  Therefore, BF's proof of claim is no longer at issue before the Court.

24  ///

25  ///

26  ///

### IV. Conclusion

Accordingly, it is **HEREBY ORDERED** that Lawsuit Financial's Motion for Summary Judgment (#306) is **GRANTED**;

**IT IS FURTHER ORDERED** that intervenor Pre-Settlement Solutions file a written response to the Court's order to show cause within fourteen (14) days of the entry of this order;

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (#307) is **GRANTED IN PART** as to Bridgefunds, LLC's proof of claim, **DENIED IN PART** as to Pre-Settlement Solutions' proof of claim without prejudice, and **DENIED IN PART** as to Lawsuit Financial's proof of claim with prejudice.

DATED this 6th day of June 2014.

_____
Kent J. Dawson
United States District Judge